DIONISIO TRIGO ET AL., Plaintiffs and Appellees, *v.* BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO, Defendant and Appellant. MANUEL CAMBLOR and JOSÉ MARÍA DEL VALLE, Plaintiffs and Appellees, *v.* BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO ET AL. MANUEL CAMBLOR and JOSÉ MARÍA DEL VALLE, Plaintiffs and Appellants, *v.* BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO ET AL., Defendants and Appellees.

Nos. 3805, 3804 and 3883. Argued April 29 and May 25, 1926.—Decided February 23, 1927.

246

*Juan de Guzmán Benítez* for the appellant in the first two cases; *Jaime Sifre, Jr., Horacio Franceschi* and *Diego O. Marrero* for the appellants in the third; *F. Soto Gras* for the appellees in the first case and as *amicus curiæ* in the other two; *Jaime Sifre, Jr., Horacio Franceschi* and *Diego O. Marrero* for the appellees in the second case, and *Juan de Guzmán Benítez* for the appellees in the third. *Attorney General George C. Butte* for defendants, the Treasurer and the Executive Secretary of Porto Rico, in the last two cases.

MR. JUSTICE FRANCO SOTO delivered the opinion of the court.

All of these cases attack the validity of a certain resolution adopted at a general meeting of the stockholders of the defendant bank for the purpose of incorporating the same under Act No. 18 Regulating Banks and Banking in Porto Rico, approved September 10, 1923.

In case No. 3805 the plaintiff stockholders of the bank prayed that the said resolution be declared void and the lower court rendered judgment accordingly. The defendant bank appealed from that judgment.

In case No. 3804 the plaintiffs, likewise stockholders of the bank, filed a complaint for the same purpose, but they also prayed for a permanent writ of injunction restraining defendant, its agents and employees from taking any steps toward the incorporation of the Banco Territorial y Agrícola under the provisions of said Act No. 18. In that case the lower court dismissed the petition for an injunction, but made no decision as to the validity of the resolution adopted by the bank, on the ground that this question had been decided in case No. 3805. Both parties appealed from that judgment.

On September 10, 1923, the Legislature of Porto Rico enacted Act No. 18, *supra,* the title of which as well as the provisions applicable to such cases read as follows:

"An Act Regulating Banks and Banking in Porto Rico.

"Section 1.—That this Act shall be known as the 'Banking Law', and shall be applicable to all corporations heretofore or hereafter organized for engaging in the banking business in Porto Rico; *Provided,* that the term 'bank' in the definition of a business shall be used only by corporations doing a banking business exclusively.

"Section 2.—That for a bank to engage in the banking business in Porto Rico, compliance with the requirements of this Act shall first be necessary, and engaging in such business without compliance therewith shall be punishable as hereinafter provided.

"Section 4.—That any five or more persons of full legal capacity may organize a bank, by executing before a notary and filing in duplicate, articles of incorporation in accordance with the provisions of this section; *Provided, however,* That banks now doing business in Porto Rico, may continue such business in Porto Rico though organized as corporations with less than five incorporators, provided they subject themselves to all other provisions of this Act; *Provided, further,* That banks doing business in Porto Rico, which have not been incorporated, shall incorporate pursuant to the provisions of this Act, within a term of six months from and after the date on which this Act takes effect.

"Said articles of incorporation *must be subscribed by each of the incorporators and duly acknowledged before a notary public.* They shall specifically state:

"(*a*) The name by which such bank is to be known.

"(*b*) The city or town of Porto Rico and *the street and number, if there is a number,* where its main office is to be established, which shall be its legal residence.

"(*c*) The amount of authorized capital stock, the number of shares into which the same is divided, the par value of each share, and when said shares are to be issued in series, the date of issue of each series, as well as the manner and term in which payment therefor is to be made.

"(*d*) The term of duration of the bank.

"(*e*) The operations to which the capital of the bank is to be preferably devoted.

"(*f*) The time and manner of calling and holding regular meetings of stockholders, and the reasons, cases and manner of calling and holding special meetings.

"(*g*) The manner of counting and the number constituting a majority at the regular and special meetings of stockholders, provided the same are not in conflict with the provisions of this Act.

"(*h*) The names and places of residence of the incorporators and the number of shares subscribed by each.

"(*i*) The number of directors of the bank, which shall not be less than five, who shall be *bona fide* residents of Porto Rico; the manner of their election, their terms of office, and the number necessary to constitute a quorum.

"(*j*) Any other articles which the incorporators may deem it advisable to insert for the regulation of the business and the conduct of the affairs of the bank, provided that such articles shall not be in conflict with this Act, or with any other laws of Porto Rico.

"Section 5.—That upon subscribing and acknowledging the articles of incorporation as hereinbefore provided and upon submitting the two copies of the same to the Executive Secretary of Porto Rico, and payment of the proper filing fees, and upon the issuance by the Executive Secretary of Porto Rico, under his seal, of his certificate that the said articles containing the statements required by the foregoing section have been filed in his office, the existence of the bank named in the said articles of incorporation shall begin, and from and after the date of such filing said bank shall be and shall constitute a body corporate under the name set forth in the said articles, subject, however, to dissolution as elsewhere in this Act provided.

"Upon the issuing by the Executive Secretary of Porto Rico of his certificate as hereinbefore provided, he shall so notify the Treasurer of Porto Rico, and at the same time shall transmit to him the duplicate copy of the articles of incorporation.

"The articles of incorporation filed in accordance with this Act, cr a copy thereof duly legalized by the Secretary of Porto Rico, shall be *prima facie* evidence of the facts therein contained."

By a public deed of July 21, 1894, the joint stock company known as "Banco Territorial y Agrícola de Puerto Rico" was organized and constituted in accordance with the provisions of the Code of Commerce, and since its foundation it has been governed by the by-laws approved in accordance with the said deed, with the exception of slight modifications made thereafter. Said by-laws established what the powers of the bank and its business should be and included, among other provisions, the following:

"Article 1.—In conformity with the provisions of the Code of Commerce, a joint stock company is hereby established to be known as 'Banco Territorial y Agrícola de Puerto Rico,' for the term of 75 years.

    \*        \*        \*        \*        \*        \*        \*

"Article 3.—The purpose of the Bank is to help property owners, lessees and tenants so as to specially promote the development of agriculture and the improvement of industries connected therewith, and to this end its business shall be:

"First: To lend money on mortgages of rural and urban properties.

"Second: The acquisition of mortgage credits on the same kind of properties.

"Third: The issuance of mortgage bonds and obligations to bearer, in accordance with sections 176 and 199 of the Code of Commerce.

"Fourth: The making of all kinds of loans in cash or securities on crops growing or harvested, cattle or other personal or collateral security that may be sufficient.

"Fifth: To endorse promissory notes or obligations payable within ninety days in order to help land owners and farmers to discount or negotiate them.

"The Bank may, in the pursuance of a wider exercise of its main business,

"(a) Receive deposits with or without interest thereon.

"(b) Open current accounts and cash checks up to the amount thus placed.

"(c) Make all transactions for which authority is given to credit associations in general and to farm-loan societies in particular."

\* \* \* \* \* \* \*

"Article 75.—Whenever a General Meeting, whether ordinary or special, is to discuss an increase or reduction of the social capital, an amendment to these by-laws, or the modification or dissolution of the company, such matters shall be expressly stated in the notice of the meeting and there shall be required for the validity of the resolutions adopted at such meeting the attendance of two-thirds of the stockholders representing two-thirds of the nominal value of the stock issued."

\* \* \* \* \* \* \*

"Article 84.—The General Meeting shall have exclusive power:

\* \* \* \* \* \* \*

"6th.—Likewise to approve or modify all other regulations of the Bank and to decide what it may think proper in regard to the amendment of its by-laws, the increase or reduction of the social capital and the liquidation or dissolution of the company, although in order to discuss the last matters mentioned all the requisites provided in article 75 shall be complied with."

On May 19, 1924, a special general meeting of stockholders passed a resolution for the incorporation of defendant bank in compliance with section 4 of Act No. 18 regulating banks, etc.

In the notice of the special meeting it was expressly stated that it was called to discuss the incorporation of the bank and the framing of its articles of incorporation. Thirty-two persons representing 313 stockholders owning 10,561 shares attended the meeting. The number of shares issued was 12,000 and the total number of shareholders was 393. So that more than two-thirds of the stockholders attended the meeting, representing more than two-thirds of the capital stock, and therefore the provisions of section 75 of the by-laws above mentioned had been complied with.

The resolution adopted by the vote of 24 representing 292 shareholders with 9,178 shares against the vote of 8 representing 21 stockholders with 1,383 shares reads, in part, as follows:

"WHEREAS, The Banking Law in force in Porto Rico approved September 10, 1923 (Act No. 18), which went into effect ninety days after its approval, provides in section 4 that banks doing business in Porto Rico, which have not been incorporated, shall incorporate pursuant to the provisions of the said Act within the term of six months from and after the date on which the Act takes effect;

WHEREAS, The managers of the Bank called a special general meeting of stockholders which was held on March 24, 1924, with the attendance of more than two-thirds of the stockholders representing more than two-thirds of the stock, to vote on the question whether or not the Bank should be incorporated, and as a consequence of the deliberations of said general meeting it was resolved that it was the wish of the meeting to comply with said banking law following other banking corporations; but said resolution being opposed by a minority of stock and stockholders and a controversy having developed as to the possibility of incorporating the bank without changing its personality, it was decided to postpone the matter with instructions to the Board of Directors to inquire from Government officials and authorities as to the manner of making such incorporation according to the law and that in case it was necessary to make a final decision in order to effect the incorporation to submit the matter to a general meeting;

"WHEREAS, The Board of Directors reports that after conferring with the Treasurer, the Executive Secretary and the Attorney General of Porto Rico, it has been informed by said functionaries that the bank should be incorporated in compliance with the law, but that it was not incumbent upon them to tell the bank how it should be incorporated, and therefore there is still the urgent necessity to take a decision in the premises;

"WHEREAS, For the above reason the Board of Directors of the Bank has called the present General Meeting of stockholders, attended also by more than two-thirds of the stock and stockholders, and has submitted the above report together with articles for the incorporation of the bank without changing its personality, said incorporation to be effected by several incorporators appointed by the General Meeting after approving the articles of incorporation;

"WHEREAS, A similar course has already been followed by other

banking institutions which like this company had been organized in conformity with the Code of Commerce and have been incorporated and filed their articles in the office of the Secretary of Porto Rico, as for instance the 'Banco Popular de Economías y Préstamos de San Juan, P. R.' and the 'Caja de Economías y Préstamos de Cabo Rojo, P. R.';

"WHEREAS, After duly discussing the matter this General Meeting has resolved to comply with said Act provided it does not become necessary by reason thereof to change the status of the bank but on the contrary, as stated in the law, this bank shall continue doing business as in the past;

"THEREFORE, The General Meeting resolves:

"1st.—To incorporate the 'Banco Territorial y Agrícola de Puerto Rico' under the articles of incorporation approved by this General Meeting which read as follows: . . . . "

The trial judge, in setting forth the grounds for declaring void the resolution passed by the majority of the stockholders, said in part as follows:

"Defendant bank is a joint stock company constituted in 1894 in conformity with the provisions of sections 1 and 4 of Article 1, Book Two, of the Code of Commerce then and now in force.

"If it were only a case of dissolving the joint stock company to create a corporation, there is no doubt that a majority had authority to adopt such a resolution and it would be lawful that a certain number of the old stockholders should prepare and subscribe to the articles of incorporation thus creating a new entity. But the situation in this case is different. It appears from the articles of incorporation above quoted that the capital of the corporation was constituted by that of the old company, and that the latter's stockholders are turned (some of them against their will) into stockholders of the bank. Hence, the seriousness and importance of the question to be decided.

"But has it a majority of sufficient authority to compel a minority not only to liquidate the entity of which they were members but also to organize a new entity and to subscribe thereto with their holdings in the old one?

". . . . . The automatic conversion of a joint stock company. organized under the provisions of the Code of Commerce into a corporation in compliance with the Special Banking Act of 1923

cannot be considered as a mere modification, as a mere change in appearance, form or external apparel. Such conversion necessarily implies the extinction of the former entity.

"If a joint stock company can resolve its dissolution by a majority vote, it cannot go farther and convert itself into a corporation and compel the old stockholders to subscribe to the new corporation against their expressed will, making them stockholders therein. Still less can it dispose of the capital of the first to constitute the capital of the second.

"A joint stock company is created by private contract entered into by parties, and the essential bases, stipulations and conditions thereof are set down in a public deed and recorded in the Mercantile Registry. When this is done the juridical personality thus created comes to life. Every essential agreement which is changed must appear in a public deed and be recorded also in the Mercantile Registry.

"A corporation presupposes other formalities essentially different. It is created by several incorporators and must necessarily submit to legislative control. This implies a contract with the intervention of the State as a party to authorize the same, to modify or alter its stipulations, and to end its life for proper causes.

"But the fact of the filing in the office of the Secretary of Porto Rico of the articles of incorporation and of the failure to insert a clause or provision explicitly acknowledging the obligation to liquidate, and on the contrary expressly opposing, in the arguments on these cases by means of counsel, the process of liquidation, carries us to the conclusion that what they have done and are trying to do is to convey to the new bank all the properties of the former bank without the consent of some of the stockholders and to compel the latter against their will to accept a novation of their contract and to assume new obligations which they do not wish to undertake.

"Moreover, the incorporation of the bank fundamentally alters the former contract of partnership, inasmuch as by virtue of the last paragraph of section 35, of said special banking law, in connection with section 5 of the Act of May 9, 1911, and subsequent amendments, defendant bank becomes a corporate entity subject to be dissolved by the Legislature which may also modify, suspend or revoke the articles of incorporation or the amendments thereto. Such change or transformation essentially affects the character or nature of the legal personality of defendant and cannot be effected without the unanimous consent of the stockholders."

The same trial judge in his conclusions for the dismissal of the petition for injunction reasons as follows:

"After a careful examination of the briefs filed by counsel, we reach the following conclusions:

"1st.—The bank is a joint stock company organized under the provisions of the Code of Commerce. It cannot be considered as a corporation under the provisions of the banking law. It cannot be reorganized, changing its constitution, without the unanimous consent of all the stockholders. These phases of the controversy were amply and properly discussed in the opinion of the court in the case of *Dionisio Trigo et al.* v. *Banco Territorial y Agrícola de Puerto Rico*, Civil No. 720, in which judgment was rendered on March 27, 1925.

"2nd.—The bank must modify its present constitution and organize itself in the manner required by the provisions of the Banking Law now in force. This law, as acknowledged by plaintiff, contains reasonable regulations and is upheld by the 'Police Power' doctrine. The provisions of section 4 thereof are not void because of the imposition on the existing banks of the obligation to incorporate.

"The Insular Government, as representative of the State, has the power to regulate and supervise the business of this bank and of any others now in existence or to be created in the future. Not only those matters relating to supervision or regulation but those bearing on the fundamental organization of any bank are based on the doctrine of Police Power, because the banking business is now and has been for a long time considered by the highest courts in the United States as a business of a quasi public nature.

"The argument that the requirements of the law in question imply the absolute and complete destruction of a business established under another law is groundless. No business is destroyed; the only thing required is a uniform organization to enable the Government to exercise a more adequate and efficient control of the banking business, the growing importance of which in the economic life is undeniable. For the attainment of the end in view the Legislature thought it necessary to have the entities engaged in the banking business incorporated. It does not hinder or obstruct it, but prescribes the manner of doing it.

"The law in question does not impair the property rights protected by Article VIII of the Treaty of Peace. There is no allega-

tion in the complaint, nor has anything been shown regarding the property rights infringed by requiring the bank to comply with section 4 of said Act.

"It is alleged that the bank had been organized under the provisions of the Code of Commerce, and that its term of life (75 years) has not expired and that the law has infringed its right to use the first-mentioned form of organization by refusing it to do business except as a corporation. But is it a property right what can only be considered as an authorization to adopt a particular form of association? And if the protection secured by Article VIII of the Treaty of Paris is invoked, it must also be borne in mind that Article IX grants to Spanish subjects residing in the Territories which Spain relinquished or ceded the right to carry on their enterprises, businesses or professions, 'being subject in respect thereof to such laws as are applicable to other foreigners.'

"It is indisputable that the Police Power of the United States Government in Porto Rico or The People of Porto Rico cannot be subordinated to, or limited or restricted by the Treaty or by the act itself of acquiring the territory.

"As we said before, the banking business is a proper subject of legislative control by virtue of the Police Power of the State, and by its nature and its relation to public life and the resources of the State such power may be extended even as to forbid banking enterprises which do not comply with the conditions required.

"The free exercise of the banking business might work hardships on the public, and in order to prevent them the legislatures of the states have resolved to bring it under their control, which in certain circumstances may amount to prohibition.

"The contention that part of the Act in question is not constitutional because those of its provisions affecting the bank and requiring its incorporation are not covered by the title, has no great weight.

". . . . . It is not necessary to enter into elaborate arguments to conclude that the provision requiring the incorporation of all banking institutions in the Island is consistent with and covered by the title."

A certain inconsistency appears between these two grounds and those which were used as a basis to declare void the resolution of May 19, 1924. The contradiction appears plainly, as it seems illogical to require the proper application of Act

No. 18 regulating the banks already in existence, upholding
the constitutionality thereof, and at the same time declaring
void the resolution embodying the incorporation of defendant
bank in compliance with said act. However, the reasoning
of the trial judge upholding the soundness of the Act and its
application to the banks existing at the time of its enactment
seems more in harmony with the general trend of authorities
and writers in their construction of modern laws enacted for
the protection of the public.

The theory of the plaintiffs, who are minority stockholders
and who objected to the resolution of incorporation, rests on
the principle that defendant bank being a joint stock company
organized under the Code of Commerce, its incorporation
would change its personality and convert it into a distinct and
newly created bank to which defendant must convey its stock
and properties, and this, they allege, can not be done without
the unanimous consent of all the stockholders.

There is, however, a great discrepancy in the arguments
of plaintiffs to support their contention. While the attorneys
for Camblor *et al.* allege that the joint stock companies men-
tioned in the Code of Commerce are really corporations and
therefore need not be incorporated, those for Trigo *et al.*
contend that such companies can not be considered, owing to
their nature, as such corporations, resembling rather those
known in American law as Joint Stock Companies.

The Spanish Code of Commerce which went into effect in
Porto Rico on the 1st of May, 1886, is the law regulating
mercantile partnerships, among which are included joint
stock companies, and while it is one of the codes which has
not been revised by our Legislature, it is indisputable that
some of its provisions were repealed by the change of sov-
ereignty (as for instance the provisions relating to bank-
ruptcy), and in general it became subject to a construction in
harmony with any national or local laws that might affect it.
Thus in the case of *Martínez* v. *Asociación de Señoras Damas*

*del Santo Asilo de Ponce,* 213 U.S. 20, referring to companies organized under Spanish rule, it was held that said companies had become under the present sovereignty Porto Rican corporations, and as far as these cases are concerned and after considering the provisions of the Organic Act of April 12, 1900, to provide a civil government for Porto Rico, the court said:

"In the form of government, which is typically American, the creation and control of corporations is exclusively a legislative function. We are of the opinion that the effect of the organic act is to intrust that function, so far as it relates to a corporation of the kind under consideration, whose essential qualities need not be repeated, to the government of Porto Rico, and that such a corporation is now, if a citizen of any country, a citizen of Porto Rico. We need not consider whether the corporation has more than a *de facto* existence, subject to the will of the Porto Rican legislature."

Therefore, all of the questions relating to the nature of joint stock companies, to the private contractual character of the relations between the stockholders and defendant bank, it being alleged on that account that defendant bank can not be compelled to incorporate because it would amount to converting it into a corporation which being a creature of the State would be subject to dissolution and liquidation, thus destroying by this change vested rights of the bank and its stockholders acquired during the Spanish rule and protected by the Treaty of Paris which put an end to the war between Spain and the United States, have not the importance given them under the circumstances of the present cases. Even theoretically it is more exact to say that corporations like the so-called joint stock companies are at present creatures of the law. The history of legislation shows that at first they were created by grants of kings; later by government concession, and in modern times by law. The changes have kept pace with the progress in the systems of government. Banking corporations were created by special acts under the authority of the law; but owing to the evils resulting from the

power inherent in legislatures to create such institutions by special acts, constitutional provisions were devised restricting such powers. At present banking corporations are usually created under general laws which together with the articles of incorporation constitute their charters. 3 R.C.L. 384. This form of organization under general laws was established for joint stock companies in Spain by the Code of Commerce of 1829 and is still in force under the present code enacted in 1885 which compiled and codified the laws relating to the different joint stock companies and which had been until then in force under the enactment of special laws and royal decrees, as we shall see later.

However, whether it is a case of one or the other legislation respectively creating corporations or joint stock companies, the law does not overlook the contractual character of the relations between the organization and its stockholders who are entitled to the protection afforded by the article of the Federal Constitution prohibiting the States to enact laws impairing contractual obligations. All the plaintiffs strongly emphasize this point, but none of the provisions of the Banking Act of 1923 operate to that effect. The rights of the stockholders of the defendant bank as well as those of the public in general are not impaired but rather secured by the reasonable regulations established by said act. Since the banks have become the arteries through which the wealth of the country circulates as well as indispensable factors in the development of the sources of economic life which are trade, manufactures and agriculture, their operations even for private gain are considered public and are unanimously considered as a matter proper for legislative regulation under the state police power.

Regarding this inherent power of the State the authorities hold as follows:

"The fourteenth amendment to the constitution of the United States does not interfere with the proper exercise of the police

power of the several states. Accordingly the provisions of this amendment prohibiting any state from depriving any person of life, liberty, or property without due process of law do not operate as a limitation upon the police power of the state to pass and enforce such laws as, in its judgment, will inure to the health, morals, and general welfare of the people; nor do they prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the public." 6 R. C. L. 197–8.

"Although at common law the business of banking was regarded as one of the lawful occupations in which citizens might engage, it is generally recognized that the banking business is of such a character as to warrant the legislature, in the exercise of the state's police power, to impose reasonable regulations upon the means and methods by which it is conducted." 6 R. C. L. 220.

Among the cases cited in support of these principles under note No. 13 in 6 R.C.L. 220, is that of *Noble State Bank* v. *Haskell,* 219 U.S. 104. Although there the action was one for an injunction to prevent the payment of a tax for the purpose of creating a Depositor's Guaranty Fund, such an extent was given to the power of the states regarding the banking business as to hold that not only could they regulate the business but even prohibit it when the statutory provisions were not complied with. In this connection the Supreme Court, through Mr. Justice Holmes, said:

"The question that we have decided is not much helped by propounding the further one, whether the right to engage in banking is or can be made a franchise. But as the latter question has some bearing on the former and as it will have to be considered in the following cases, if not here, we will dispose of it now. It is not answered by citing authorities for the existence of the right at common law. There are many things that a man might do at common law that the State might forbid. He might embezzle until a statute cut down his liberty. We cannot say that the public interests to which we have adverted, and others, are not sufficient to warrant the State in taking the whole business of banking under its control. On the contrary we are of the opinion that it may go on from regulation to prohibition except upon such conditions as it may prescribe. In short, when the Oklahoma legislature declared by impli-

cation that free banking is a public danger, and that incorporation, inspection and the above-described coöperation are necessary safeguards, this court certainly cannot say that it · is wrong. *North Dakota* v. *Woodmansee,* 1. N. Dak. 246. *Brady* v. *Mattern,* 125 . Iowa, 158. *Weed* v. *Bergh,* 141 Wisconsin, 569. *Commonwealth* v. *Vrooman,* 164 Pa. 306. *Myers* v. *Irwin,* 2 S. & R. 368. *Myers* v. *Manhattan Bank,* 20 Ohio, 283, 302. *Attorney General* v. *Utica Insurance Co.,* 2 Johns Ch. 371, 377.''

This case, which held that the banking business may be limited to corporations, put an end to the protracted discussions which had been kept in the different states concerning laws which limited the banking business in that way and has been followed in subsequent decisions of the Supreme Court of the United States, of which we will cite the following: *Shallenberger* v. *Holstein First State Bank,* 291 U.S. 114, 31 S. Ct. 189, 55 U.S. (L. ed.) 117; *Assaria State Bank* v. *Dalley,* 219 U.S. 121, 31 S. Ct. 189, 55 U.S. (L. ed.) 123; *Engel* v. *O'Malley,* 219 U. S. 128, 31 S. Ct. 190, 55 U.S. (L. ed.) 128.

One of the cases limiting the banking business to corporations, which it is important to cite for the convincing force of its arguments, is that of *Weed* v. *Bergh,* 141 Wis. 569, 124 N.W. 664, 25 R.L.A. (N.S.) 1217. The Supreme Court of Wisconsin said:

''If it should be granted that individual bankers may be successfully subjected to all the provisions as to visitation, inspection, examination, and the making of reports to the same extent as corporations, it still must be conceded that there are at least two well-defined dangers to the public which are and must be present in private banking which are eliminated in corporate banking. The first of these is .the danger that the private banker, by engaging in outside business ventures, may subject his banking assets to the claims of business creditors, and thus greatly prejudice, if not destroy, the remedies of bank depositors; and the second is the danger and inconvenience which is likely to result when a private banker dies and the business has. to be temporarily suspended for the purpose of probating the estate, involving perhaps destruction · of public confidence and a run on the institution.

''Both of these dangers are quite real and serious, and both are

quite effectually eliminated in the case of a corporation whose business enterprises are strictly limited to banking, and which does not die. It will not avail to say that possibly remedies might be devised to meet these inherent dangers arising in individual banking by other forms of regulation, though we are inclined to think that this would be very difficult of accomplishment without overstepping some of the constitutional guaranties of rights to the .citizens. If, as matter of fact, the requirement of incorporation is a form of regulation reasonably calculated to meet and remedy these difficulties, though not in the wisest way, it must be sustained as an exercise of the police power.''

Counsel for Camblor cite in their turn the case of *Noble State Bank* v. *Haskell, supra,* in support of their contention that although no contractual obligation was impaired, the Supreme Court held that the State had reserved the right to modify and alter the charter. It seems that plaintiffs give predominant importance to this question of reservation by the state of the power to modify or alter corporate charters and it is alleged that no reservation of power to modify or alter the charters of such entities was made by the Spanish Government in the Code of Commerce where the organization of joint stock companies is authorized.

Apart from what we have said already in connection with the case of *Martínez* v. *Asociación de Señoras Damas del Santo Asilo de Ponce, supra,* in the case of corporations whose organization is authorized by the state under general laws the by-laws usually prescribe the manner in which their articles of incorporation shall be amended by the stockholders. 7 R.C.L. 112. And this was also usually the case in the organization of joint stock companies (Articles 75 and 84 of the by-laws of defendant bank, *supra*). But if no provision was made, the Code of Commerce contained the suppletory provisions according to which the by-laws could be modified.

Article 168 of the Code of Commerce provides:

''Corporations holding a general meeting of stockholders previously called for the purpose shall have the power to resolve upon the reduction or increase of the corporate capital.

· "In no case can these resolutions be adopted at regular meetings unless it has been stated, in the call or at a sufficient time in advance, that an increase or reduction of the capital would be discussed and voted upon.

"The by-laws of each corporation shall fix the number of members and the amount of capital which shall be required to be present at meetings at which said capital is to be reduced or increased or in which the modification or dissolution of the corporation is to be acted upon.

"In no case shall it be less than three-fourths of the number of the former and two-thirds of the par value of the latter."

It is plainly seen from the by-laws of defendant bank as well as from the suppletory law that the unanimous consent of the stockholders is not necessary in order to modify or amend the by-laws of a joint stock company.

Carrying to extremes the argument on the right of the State to reserve the power to modify the by-laws of a. corporation, they have gone so far as to say that even the public nature of the business of a private corporation is equivalent to an implied reserve on the part of the State of its power to subject such corporation to regulation in a way similar to its power over corporations organized under the express reserve of the regulating power of the State.   7 R.C.L. 618.

The evolution and development of joint stock companies under the Spanish laws show on the other hand that in the changes of organization and constitution thereof there have been transitory provisions permitting the continuance of those joint stock companies in existence which desired to submit to the new legislation, and that did not mean the creation of a new entity nor alteration in its personality.

Joint stock companies made their appearance under Spanish law when the Code of Commerce of 1829 was enacted, since the Ordinances of Bilbao did not mention at all this sort of companies. *Enciclopedia Jurídica Española,* vol. 7, p. 372.   It was necessary to submit their articles of incorporation to the courts for examination and the court's approval

was a requisite for its legal operation, Article 293, as well as its registration in a public register. The Act of January 28, 1848, amended the Code of Commerce in regard to the organization of joint stock companies, requiring their publicity and approval by the Government. After this amendment there began to appear those special joint stock companies which being unable to function under the general provisions of the Code of 1829 were later subjected to a series of legal provisions supplementing said code. The Act of January 28, 1856, established credit stock companies which were forerunners of the banks or joint stock companies engaged in the banking business.

The decree of October 28, 1868, repealed the joint stock company Act of January 28, 1848, and re-established the provisions of the Code of 1829 in regard to said companies, pending new legislation on that subject, without prejudice to their option to choose, by means of a resolution adopted in a general meeting of stockholders, to continue either under the re-pealed Act of 1848 or under the Code of Commerce. Alcubilla, vol. 2, p. 496.

This was a transitory provision, the option being left to the stockholders and if they chose the original Code of 1829 there was no discontinuance in the existence of the same entity.

The spirit of the Spanish revolution of 1868 was already making itself felt in legislation, and the royal decree of February 5, 1869, issued by the Department of Commerce and Industry established general bases for the granting of liberal conditions to credit institutions. This was followed by the Act of October 19, 1869, providing for the free creation of banks, and mercantile, industrial and credit associations.

As shown by the provisions of that Act, innovations were made therein modifying the organization of banks and other entities, but it also established the principle authorizing the transition from one system to another without changing the

personality of those already in existence. Section 13 of said Act says:

"Banks and associations at present existing under governmental authority shall continue to be governed by their by-laws, but they may avail themselves of the benefits granted by this Act hereafter constituted, provided it is so resolved by their stockholders in a general meeting, expressly called for that purpose, by the number of votes required by their by-laws for a modification of the social contract, or by a majority of two-thirds of the capital when there is no provision made therein for that emergency. In the case mentioned said companies shall be subject to all the provisions of this Act."

In the case of entities whose by-laws had made no provisions for the modification of the partnership contract the Act of January 21, 1870, was enacted as a supplement thereto authorizing such entities to amend their by-laws so as to bring them into the provisions of the new law, but this did not mean the creation of a new entity. Said act reads as follows:

"Only Section.—Banks and companies existing at present under governmental authority whose by-laws make no provision for modification, may amend one or more of their articles if it is so resolved in a general meeting called for that purpose by a number of votes representing four-fifths of the capital stock; it being understood that such modifications shall never affect either the rights of creditors or the special rights that may be possessed by some of the members. If at a first meeting called for that purpose there is not a sufficient number of votes represented either personally or by proxy making up four-fifths of the capital stock, it will be sufficient if at a second meeting there is represented a majority of said capital stock."

Then came into effect the Spanish Code of Commerce of 1885, made applicable to Porto Rico by a royal decree of January 28, 1896, under whose provisions defendant bank was organized. This code unified the various laws enacted after the Code of 1829. It establishes rules for the constitution and organization of joint stock companies in general and for special banking companies, banks of issue and discount, etc.

Articles 151 *et seq.*. Important innovations have been introduced in regard to this matter and the law, foreseeing the contingency that existing entities might wish to come under the new statute owing to their constant development, has established that transitory provision to enable them to modify their by-laws without losing their personality. Thus section 159 provides:

"Corporations existing prior to the publication of this code, and which are still governed by their regulations and by-laws, may choose between continuing to be governed thereby or by the provisions of this code."

In conformity with the above section was worded section 2 of the royal decree of January 28, 1886, making applicable to Porto Rico the provisions of the Code of Commerce, which reads:

"Companies existing on April 30, 1886, shall exercise the right granted them by article 159 of the Code of Commerce, by means of a resolution passed at a special general meeting convened expressly in accordance with their by-laws, or else, in accordance with the Act of January 21, 1870, held to be applicable to the Islands of Cuba and Porto Rico . . . . ." Code of Commerce annotated by Romero Girón, p. 646.

We have quoted the Act of January 21, 1870, as making suppletory provisions for those cases where no provision was made in the by-laws of existing entities for their reformation or modification.

All the above precedents clearly show that the transitory section 4 of the Act of 1923, making said Act applicable to banks now doing business in Porto Rico, is no novelty. This Act was enacted to meet the demands and requirements brought about by the change of our political institutions which had necessarily to affect the development of economic interests and especially that of commerce which, being such a vital force, always tends to increase and which had attained an increment not to be overlooked during the last years. A

statute such as the Spanish Code of Commerce which was of ancient date and whose reform was sought even in Spain was insufficient to serve as a solid basis for banking operations. Banks have multiplied, cash deposits have increased with the expanding wealth, and the Government itself has become an important customer on account of its large deposits in such institutions. All this demanded uniform legislation in harmony with the new conditions and providing an efficient and reliable security for the public and becoming of benefit to the stockholders themselves by making their investments safer and more productive. Therefore, what is provided by the Act of 1923 is a uniform system applying to banks of new creation as well as to those already existing. The latter are required to come under the harmonic plan which equally covers such institutions and they are not in the least required to change their personality, nor is it necessary for that purpose to obtain the unanimous consent of the stockholders. The question to be raised, however, in regard to existing banks, is not the form or manner of incorporation which as a matter of procedure is not important and which of course is not the same as that followed by banks newly created, just as the procedure to be followed in the reincorporation of a national bank into a state bank and *vice versa* can not be the same as that followed by such banks when they are organized for the first time. What is important, as alleged by defendant's counsel, is to find out whether or not the articles of incorporation are in harmony with the manner of operating said banks and whether or not their character is changed thereby. But there has been no substantial change. Defendant bank continues doing business under the same name. Its legal life, 75 years, stipulated in the deed constituting it, is not interrupted, for though by the articles of incorporation (article 4) its life is fixed at 45 years, this is precisely the time left to defendant bank to complete said 75 years because it was con-

stituted in 1894. The nature of the business in which defendant bank is engaged has not changed. If a comparison is made between article 3 of the former by-laws of the bank specifying the operations in which it was engaged and section 3 of the Act of 1923 determining the various activities of banks, it will be seen that defendant bank will engage in the same banking operations without alteration as formerly. There is no interruption in its continuance. A change in this respect would have been the only ground for a discussion. As a rule this is the point held in mind by plaintiffs in their citations and which is summed up in the commentary contained in Fletcher's work, vol. 6, p. 6807.

The meaning of the word incorporation is analyzed on page 8469 of vol. 7 of said work as follows:

"Section 4839.—Reincorporation as a species of reorganization. The term 'reincorporation' does not seem to have been judicially defined but its meaning, at least in a general sense, is apparent. There is an incorporation where an existing corporation files incorporation papers, pursuant to a statute so authorizing, and takes out a new charter. Strictly speaking, it is nothing more than an amendment to the charter. Thus, in New York, a statute provides for the reincorporation of any stock corporations theretofore organized, with certain exceptions, under the provisions of the Business Corporation Law, and fixes the procedure to reincorporate in detail; but the reincorporation provided there is nothing more than the adoption and filing of a certificate containing certain facts, so as to make the existing corporation, as stated in the statute, 'a corporation organized under this chapter (Business Corporations Law),' instead of a corporation organized under some other statute.

"Reincorporation, as the term is generally used and as provided for by statutes in some states, is not the same as what is ordinarily termed reorganization. Reorganization, as the term is usually used, means the creation of a new company to take over the assets of another corporation, while reincorporation, as that term is ordinarily used, more closely resembles the amendment of a charter, and is usually resorted to either to correct errors in the original corporation, or to obtain the benefits of a statute enacted after the original incorporation, or to extend the corporate life.

"The statutes often provide for the reincorporation of special companies, such as insurance companies, or banks.

"Generally, under the statutes, there is no new corporation but the company is the same as before the reincorporation.

"The authority to reincorporate must be based on a vote of the stockholders or members as distinguished from the directors."

Moreover, nothing fundamental can be found in the articles of incorporation of the bank affecting the rights of the stockholders or destroying the identity of the personality of the existing bank. Such changes as are examined by the trial judge from among those made in the articles of incorporation and the original by-laws of the bank and referring, for instance, to the power of the president of the bank to call special meetings of stockholders and to the manner of legally constituting the same, are matters of form or procedure in regard to the conduct of the business which fall under the police power inherent in the Legislature of Porto Rico. It is true that the power of the legislature must not be arbitrary or oppressive in that or in any other respect and that the regulation thereof must be reasonable; but it is incumbent upon the state in the exercise of the police power to determine the form of regulation which is more necessary and adequate for the conduct of the banking business, and in the last resort it is for the courts to decide finally whether or not such regulations are just and reasonable. 3 R.C.L. 380. Hence, the theory of the plaintiffs that defendant bank, by incorporating, is left at the mercy of the legislature to be dissolved at any moment on account of being its creation, is erroneous. The truth of the matter is that though banks and corporations exist by virtue of the contractual will of their incorporators, they are bound to comply with the provisions of the law which are part of the constitutional chart of such organizations (7 R.C.L. 537), and the provisions for inspection and intervention of the Government in the same and in force since 1902 (section 354 of the Political Code), have as their only object to make them comply with the law in their working and

operations, and it is only when they fail to do so that they can be made to dissolve or liquidate.

It is alleged also that section 4 of Act No. 18 of 1923 is not in harmony with the title thereof and that therefore it is void in accordance with the provisions of section 34 of the Organic Act of Porto Rico of 1917. That part of section 4 which is alleged not to be covered by the title of the Act says: " . . . That banks doing business in Porto Rico, which have not been incorporated, shall incorporate pursuant to the provisions of this Act, within a term of six months from and after the date on which this Act takes effect." The paragraph of section 34 of the Organic Act referred to by plaintiffs in case No. 3883 reads as follows:

"No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in the title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

The title of the Act, which shows the subject, is as follows: "An Act Regulating Banks and Banking in Porto Rico." It seems clear that as this is a uniform law for the purpose of placing under the same regulations all banks of old or new creation doing business in Porto Rico, the provision making it applicable to banks in existence at the time of its enactment is covered by the title. A similar situation to that in the case of *State* v. *Woodmansee,* 1 N.D. 246, 46 N.W. 970, 11. L.R.A. 420. This case is very important for its bearing on the merits of the present case and it is cited as authority in that of *Noble State Bank* v. *Haskell, supra,* but confining itself to its construction of the title of a banking law in respect to the matters therein contained and similar in its subject to our statute, the court said:

"The relator further contends that said section 27 is unconstitutional for the reason that it violates the provisions of section 61 of the state constitution, which reads as follows: 'No bill shall embrace more than one subject, which shall be expressed in its title;

but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed.' Relator's contention is that section 27, in prohibiting and punishing private banking, does not relate to the subject-matter of the act as expressed in its title. There is absolutely nothing in this point. The subject of the law, as expressed in the title, is 'State Banks;' but that subject includes and comprehends not only state banks, but all other banking in the state which is related to state banking. In creating state banks, and providing for their government, the law makes the business of banking a corporate franchise; and to prohibit and punish all other banking is, in our opinion, strictly auxiliary to that subject-matter. Similar constitutional provisions may be found in most, if not all, of the states, some of the states using the word 'object' instead of 'subject,' as it appears in our constitution. This provision is intended to forestall what Judge Cooley denominates 'log rolling' legislation, and prevent legislation not fully understood by members of the legislature, as well as to prevent all surprises or misapprehensions on the part of the public. But it has been uniformly held that such provisions should receive a reasonable and not a technical construction, and that no matter should be held to invalidate a statute so long as such matter related exclusively to the same subject, or was germane or auxiliary thereto. The provision has been before the court in num berless cases, and while the construction has been uniform, the application has covered so wide a scope of legislation, and subjects so variant, that the cases seem confused and inconsistent, and no great benefit can arise from a citation of authorities. But see, however, as fully sustaining our views in this case, the following authorities: *Cooley Const. Lim.* (5th Ed.) 176; *People* v. *Parks,* 58 Cal. 635; *Davis* v. *State,* 61 Amer. Dec. 331, and note; *Fahey* v. *State,* 27 Tex. App. 146, 11 S. W. Rep. 108; *O'Leary* v. *County of Cook,* 28 Ill. 538; *Allegheny County Home's Case,* 77 Pa. St. 77.''

Finally we come to the conclusion that Act No. 18 of 1923 regulating banks, etc., is constitutional and that the resolution of defendant bank of May 19, 1924, providing for its incorporation, is valid, because the very by-laws (art. 75) under which defendant has been working since its foundation empowered the stockholders to do so.

For the foregoing reasons the judgments appealed from in cases Nos. 3804 and 3805 must be reversed and the complaints

dismissed without costs, and the judgment rendered in case No. 3883 dismissing the petition for injunction must be affirmed.

Mr. Justice Wolf dissented.

### DISSENTING OPINION OF MR. JUSTICE WOLF.

While not without some doubts, I am inclined to agree that the Noble Case in the Supreme Court of the United States settles the question that the Government may limit banking operations exclusively to corporations organized under the law. The theory, more or less, is that if a business has reached such a state that its proper control and regulation can only take place by the superintendence of the Government the latter may require that the business be only conducted by corporations over which it has complete control and which have perpetual succession. The police power exercised is essentially perhaps no different from the suppression of the liquor traffic. Under the Prohibition Law only certain liquors may be sold by specified persons; under the Banking Law only corporations are allowed to do the banking business. There must be of course some public necessity. I dissent from the other conclusions of the court.

It is my opinion that a *societé anonyme* like the Banco Territorial y Agrícola is not a corporation as the word is used in American and English law; that it partakes more nearly of the characteristics of a joint stock company. The majority opinion, to show that such an organization is a corporation, places great reliance on the case of *Martínez* v. *La Asociación de Señoras Damas del Santo Asilo de Ponce*, 213 U.S. 20. In the Supreme Court of the United States one of the parties asserted that the "Asociación" was a Spanish corporation and the court in its opinion assumed it. The court did not enter into a discussion of the nature of such an association and decided nothing on the inherent nature thereof. Of course under the civil law partnerships are generally entities, just as corporations are in the United States. The *societé*

has no seal and while it could be controlled to a certain extent by the state, it was more generally a private organization, as partnerships are, and could be dissolved as partnerships are. Partnerships could be controlled by the state probably to the same extent. However this may be, the burden lay on the Banco Territorial y Agrícola to show that it was a corporation comparable to the corporations subsequently authorized by the laws of Porto Rico or was the corporation with less than five incorporators mentioned in the act. Of course if the Banco was not a corporation it was not recognized under the banking act and was clearly bound to organize as other individuals had to do.

Assuming, however, that the Banco Territorial y Agrícola was a corporation or a certain kind of corporation, it nevertheless was not the kind of corporation authorized by the laws of Porto Rico. Even assuming that the Banco was a full fledged corporation, I can not agree that it had the right to transfer its assets in the manner attempted.

Section 4 of the Act of the Special Session of 1923, page 84, provides:

"That any five or more persons of full legal capacity may organize a bank, by executing before a notary and filing in duplicate, articles of incorporation in accordance with the provisions of this section; *Provided, however,* That banks now doing business in Porto Rico, may continue such business in Porto Rico though organized as corporations with less than five incorporators, provided they subject themselves to all other provisions of this Act; *Provided, further,* That banks doing business in Porto Rico, which have not been incorporated, shall incorporate pursuant to the provisions of this Act, within a term of six months from and after the date on which this Acts takes effect.

"Said articles of incorporation *must be subscribed by each of the incorporators and duly acknowledged before a notary public.* They shall specifically state—

"(a) The name by which such bank is to be known.

" *          *          *          *          *          *          * "

I am inclined to agree entirely with the court below that

the Banco Territorial y Agrícola de Puerto Rico, while it might incorporate, reincorporate or reorganize, had no right to do so without following the law and paying heed to the rights of minority members or stockholders. It is my opinion that the bank could not incorporate, reincorporate or reorganize without first settling with the minority members who were opposed to a change; that if in order to effect such a settlement a dissolution was necessary the bank should have been dissolved. To attempt anything else was not authorized by law. If the act attempted to give such a right it was unconstitutional as depriving individuals of their rights without due process of law.

Cook on Corporations, Sixth Edition, Vol. 2, sec. 670, p. 1992 *et seq.,* says:

"Ever since the case of Abbot v. American Hard Rubber Company, the law has been clearly established in this country that a dissenting stockholder may prevent the sale of all the corporate property where the corporation is a solvent, going concern. And even where a dissolution is the purpose in view, yet, if the corporation is a prosperous one, such a sale cannot be made. Indeed it is very doubtful whether a dissolution can ever be had at common law by a majority of the stockholders where the corporation is a going, prosperous concern. And certainly if the purpose of such dissolution is not the *bona fide* discontinuance of the business, but is the continuance of that business by another new corporation, then the rule is that a dissenting stockholder may prevent the sale, even though it is made with a view to dissolution of the corporation. This is the law as laid down in the well considered case of Kean v. Johnson." (9 N. J. Eq. 401).

*Emery* v. *Kalamazoo & Hastings Construction Co.,* 132 Mich. 560, held that a majority of the stockholders of a limited partnership association have no power to wind up its affairs by exchanging its property for stock in a corporation and compelling a non-assenting stockholder to become a member of the corporation and accept stock for her holding.

*Mason* v. *Pewabic Mining Co.,* 133 U.S. 50, referring back

to partnerships, held that the rights of minorities must be respected. *Schwab* v. *E. G. Potter Co.*, 194 N.Y. 409, deciding to the same effect, showed that one entity could not create another. Other excellent cases are *Farish* v. *Cieneguita Copper Co.* (Arizona), 100 Pac. 781, and *Blais et al.* v. *Brazeau,* 56 Atl. 186. If an entity can not lawfully do these things, neither can the Legislature, and an attempt so to do is, in my opinion, not due process. See 7 R.C.L. 97.

If one of the purposes of the act was the continuance of the existing corporation and of the same personality, the title of the act failed to draw attention to this feature of the law and hence the act failed to follow the provisions of section 34 of the Organic Act. However, as I maintain that section 4, properly considered, does not so enact, I believe the title covers all the purposes of the act.

It is my conclusion that section 4 only referred to the continuation of the corporation already organized as such; that the Banco was not such a corporation and that if it were such a corporation it had no right to a reorganization without the consent of the minority stockholders and that what was attempted here was a reorganization and not a reincorporation.

To say that the act does authorize some persons to take the property of individuals and integrate it into the property of a corporation, to make persons surrender property interests to a corporation, would not be due process of law. An interpretation should be given as would prevent such an unconstitutional result.

Under the Banking Law a distinct personality or entity is allowed. The Banco could not by resolution and agreement convert itself into such a personality or entity any more than one individual could convert itself into another. Dissolution and reorganization was necessary.